Eanney, J.
The agreed statement of facts, signed by the parties, and -upon which this cause is now submitted to the court,, makes the whole controversy depend upon the solution of this *379 question—Is the county of Noble, at this time, a legally organized and existing county of the state ? If it is, it is conceded the defendant is the probate judge thereof, and exercising his office within it, and not elsewhere; if it is not, he is assuming to act within the boundaries of the county of Morgan, and is guilty of the intrusion and usurpation charged upon him.
The act to erect the county of Noble was passed by the last general assembly convened under the constitution of 1802, on the 11th day of March, 1851, the next day after the adoption, by the convention, of the constitution now in force.
It is expressly admitted by the counsel for the relator that the legislature, “ at the time the law was passed, had full power under the old constitution to enact such a law; ” that the county was legally organized under it, and continued to exist until the first day of September of that year, when the present constitution took effect. But they insist that its continued existence is inconsistent with the provisions of that instrument, and, “ if inconsistent with it, like all such laws previously existing, it ceased to be a law on the first day of September, a. d. 1851, and the legal existence of the county ceased at the same time; and, as a consequence, for the want of a legal existence of the county, the defendant, by . ^virtue of his election to the office of probate judge, can not lawfully exercise the office, the territory embraced within the county, by legal operation, having fallen back to the original counties from which it was taken.” In short, their position is that the law erecting the county is inconsistent with the present constitution, and was repealed by it when it took effect. If such inconsistency is found to exist, after a fair and honest effort to reconcile them, it can not be doubtful which must give way, and the conclu- ' sion contended for by the relator would inevitably follow.
The rule by which we should be guided in pursuing this inquiry is well settled. As repeals by implication are not favored, the repugnancy between the provisions of two statutes must be clear, and so contrary to each other that they can not be reconciled, in order to make the latter operate a repeal of the former. This rule is the result of a long course of decisions, and we know of no reason why it does not equally apply, when the repugnancy is alleged to exist, between a constitutional provision and a legislative enactment. With this principle in view, we proceed to the inquiry, Does such necessary and obvious repugnancy exist between the law creating *380 this county and the constitution ? It is claimed by the relator to arise from the necessary workings of the 9th article of the constitution, and the 19th section of the schedule, apportioning the state for senatorial, representative and judicial purposes; and it is insisted that the continuance of the county has the necessary effect of altering the territorial arrangement prescribed by the constitution for these purposes, and of depriving the inhabitants of this county of their right of suffrage and representation .in these departments of the government. If this conclusion is legitimately drawn, it can not be doubted that the law must give way and the county cease to exist. The constitution divides the wh.ole state for these purposes, and secures to all the people in it these important rights —rights lying at the very foundation of every free government, and not to be invaded or impaired by any ^legislative enactment, either prior or subsequent to its adoption.
We further agree with the counsel for the relator that the constitution must receive the same construction since its ratification by the people that it would have received when it passed from the hands of the convention. , By its own provisions, however, it could have no effect until ratified by the people, and until the first of September following the time fixed for its operation. As a necessary result from this principle, things as they existed on the 10th of March, when it was adopted by the convention-, must control in its construction. In short, the instrument speaks from the 10th of March, although by its own terms its effect was postponed to the first of September. As a further consequence, the apportionment of the state must be regarded as made by the convention, and none the less so because the approval of the people was made necessary to its ultimate effect. They but ratified and approved an act already done by their representatives in convention, and were not, in any correct sense, the authors of the act itself.
Before proceeding to a particular examination of the question in its application to each of the departments of government before mentioned, it will be necessary to have a- clear understanding of two propositions, equally applicable to each, and upon which, it seems to me, all correct reasoning must proceed. '
And first, the constitution apportions political power amongst the inhabitants of the state as neaidy equally as possible, in proportion to numbers, without any regard whatever to property, or, indeed, to any other circumstance. Inhabitants alone are represented; a *381 given number in one place exercise tbe same political power as a like number in any other locality. I am aware that some departure from the absolute equality of numbers is allowed in favor of the inhabitants of small counties, in the constitution of the house of representatives; but this in no wise changes the basis of representation from population to territory or property.
^Second, the whole state is divided into districts, and the limits of each clearly and definitely fixed. These limits were, in every instance, described by county lines, as they existed when the constitution was adopted by the convention—the boundaries of counties being referred to and adopted, from convenience and propriety, as the boundaries of districts ; and thus making the limits of each district as certain as though it had been marked out by natural or artificial objects. While the counties remained as they then were, of course, no one of them could be divided so as to fall into different districts. But while the boundaries of counties, to a cei'tain extent, and districts, were fixed upon the same lines, they were yet independent of each other; so that whatever changes' might be made in county limits, the lines of the districts remained as before, subject only to such changes as are provided for in the constitution itself.
How far changes are authorized, and by whom, and in what manner effected, I shall have occasion to notice particularly in the further progress of this opinion.
To construct a scheme of constitutional apportionments, to endure for many years, and, so far as the election of members of the-general assembly is concerned, subject to no control or-alteration by that body, is a work of much difficulty, when it is considered how constantly and materially changes are being wrought in the political divisions of the state, and in the relative increase of population. And yet I am much mistaken if the system adopted by the convention is not found entirely adequate to accomplish all the substantial purposes proposed, and one of the most valuable features-of the constitution. The state has been subjected to a most humiliating experience, while the power was left with the general assembly ; and the scenes of anarchy and confusion, which had marked its exercise there, undoubtedly determined the people to deprive that body of it absolutely, so far as the election of their own members was concerned, for the future.
*382 *Sligbt inconveniences may arise from this determination, but evils of much graver importance will be avoided.
With these considerations in view, and considering the foregoing propositions as undeniably correct—that all the inhabitants of the state have the constitutional right to be represented in the legislative and judicial departments, and all the electors of the state the right of suffrage in their several districts, to elect the necessary officers to fill these departments; and also that no change can be made in the constitutional districts, other than those expressly provided for in the constitution—we are brought to the direct question : Can Noble county continue to exist, consistently with the full enjoyment of these constitutional rights?
After a careful examination of all the objections urged, four of the members of this court are of opinion that it can; and that there is no necessary conflict between the law creating it and the constitution of the state.
A more detailed examination of these objections, in their application to the election of senators, representatives, and judges of the court of common pleas, will sufficiently illustrate the grounds upon which our conclusion is based. .
I. By the 7th section of article 9, the state is divided into thirty-three senatorial districts, electing, for the first decennial period, thirty-five senators. Of these districts, the counties of Washington and Morgan constitute the fourteenth, and Guernsey and Monroe the nineteenth. Prom these two districts, the county of Noble was afterward taken, and the consequence is, a part of the citizens of this county must continue to vote, and be represented in the senate, in one of these districts, and the residue in the other. By the 10th section of the same article, it is expressly provided “ that no •change shall ever be made in the principles of representation as herein established, or in the senatorial districts, except as above provided.” The exception refers to the 8th and 9th sections, the •first of which provides for the apportionment of fractions, after the ■first ten years, and for annexing districts which may fall below three-fourths of a senatorial ratio *to an adjoining district; and the last gives to any county included in a senatorial district, which has acquired a population equal to a full senatorial ratio, the right, at any regular decennial apportionment, to be made into a separate senatorial district, if a full senatorial ratio is left in the •district from which it is taken. Subject to these qualifications, *383 ■which have no bearing upon the question under consideration, the districts formed by the constitution must forever remain unchanged.
These districts, as we have already seen, are composed of the territory embraced in the counties named at the time they were made, .and are not liable to fluctuate with any subsequent change of county limits. Are such changes of county lines therefore prohibited ? If not, it is very clear that they may always result in leaving part of ■a county in one senatorial district, and the residue in another. That no such prohibition, or any provision requiring the senatorial districts to continue to be bounded by existing county lines, is to be found in the constitution, must be admitted. On the contrary, the convention adjourned, leaving a legislative body in session with full power, as is admitted, to work such changes ; and by section 30 of article 2 such changes are expressly provided for after the constitution should have taken effect. If this county had been erected since the constitution took effect, with the same boundaries it now has, and, of necessity, divided for senatorial purposes, it is admitted the .act would be without objection, and its existence entirely consistent with the other provisions of the constitution. How the same precise ■effect, worked by a law passed by a general assembly having full power to do so, before the constitution was in force, can be said to be inconsistent with the same provisions, is what we are unable to understand.
The truth is, the power to make new counties and change county lines has always existed under both constitutions; under that now in force, it is true, subject to very important safeguards. Its exercise under either, since the apportionment made by the convention, might work the inconvenience *of dividing a county into different senatorial districts, but could not in any manner deprive the inhabitants of their right of representation and suffrage in electing members of that body, or work any change in the boundaries of districts. This inconvenience should constitute a very strong argument against the exercise of the power, unless in cases of strong necessity, but can not in the least detract from the power itself; and the power must in all cases be measured by the constitution in force when the law is passed.
II. The next inquiry relates to the election of members of the house of representatives.
Section 10 of article 9, already quoted in part, provides: “For *384 the first ten years after the year one thousand eight hundred and. fifty-one, the apportionment of representatives shall be as provided-in the schedule, and no change shall ever be made in the principles-of representation, as herein established, or in the senatorial districts, except as above provided. All territory belongi ng to a county at the time of any apportionment, shall, as to the right' of representation and suffrage, remain an integral part thereof, during the decennial period.” By reference to the 19th section of the schedule, it will be seen that the counties of Morgan, Monroe, G-uernsey and Washington, are each constituted separate representative districts, and a representation awarded to each, according to the population-, it then contained.
These provisions irrevocably fix the .districts, and apportion the representation for ten years. At the expiration of that period, Other sections of the 9th article direct specifically in what manner the executive officers charged with the duty, shall ascertain and fix it for another period of ten years; but it is unnecessary to refer to-them in detail, as they throw no light upon the pending question. It is sufficient to say that, in pursuance of the principles established in this article, and which are forever to remain unchanged, an apportionment is to be made once in ten years—the ratio for a representation being ascei’tained by dividing the whole population of the state by the number one hundred ; each *county then, existing having a population equal to half said ratio is entitled to-a separate representation, and those falling below that number are to be attached to the adjoining county having the least population.
From all this it is manifest that no change, alteration, or modification of the representative districts is allowed between the periods of decennial apportionment; and all that has been said of the-senatorial districts is, to this extent, strictly applicable to the representative districts, but, unlike the senate districts, they are not. forever to remain unchanged. On the contrary, they must, of necessity, at the expiration of each ten years, so change as to conform, to the boundaries of counties as they are then found to exist; and. the limits of districts at those periods become again identical with those of counties.
Now, by the first clause of section 10, article 9, it is provided: '‘For the first ten years after the year one thousand eight hundred and fifty-one, the apportionment of representatives shall be as pro- *385 Tided in the schedule.” This apportionment, as we have already settled, was made by the convention on the 10th of March, 1851,. although subsequently approved by the people. At that time the territory now included in Noble county belonged to1 the counties from which it was taken, and it necessarily follows, not only from the principles already discussed, but by the positive provision of the last clatise of the same section, that this territory must continue during the decennial period, “as to the right of representation and suffrage, to remain integral parts” of such counties. This result, so far from being inconsistent with the operation of this apportionment, is the very state of things contemplated by that clause, and the very state of things which must always occur whenever a new county is made, or a county line changed, between the-periods of decennial apportionment; and, I may add, the very state of things provided for by section 3, article 7, of the constitution of 1802. But it is claimed that this clause only provides for territory taken from a county after the present constitution *took effect. The phrase is, “belonging to a county at the time of any apportionment.” Now, if the convention did make an apportionment for ten years, and did make it on the 10th of March, as we have supposed, the language would seem to be too plain to admit of construction, and its application to this apportionment too obvious to require comment. That they did make it, and at that time, we have already settled without the least doubt in our minds.
It was made by the convention to take effect at a future day, provided it was ratified and approved by the people.
III. The judicial apportionment. -
By the 12th section of article 9th, the county of Washington is placed in the third subdivision of the seventh judicial district, and the counties of Monroe and Guernsey in the second, and the county of Morgan in the first subdivision of the eighth district. The general principles already discussed being equally applicable to these districts need not be again repeated. An important distinction is, however, here to be noted. While the general assembly is deprived ■ of all power over the legislative districts, they are invested with . full authority to alter, change, and add to the judicial districts. \ The 15th section of article 4th provides: “The general assembly may increase or diminish the number of the judges of the supreme court, the number of the districts of the court of common pleas, *386 the number of judges in any district, change the districts, or the ■■subdivisions thereof, or establish other courts, whenever two-thirds of the members elected to each house shall concur therein; but no such change, addition, or diminution shall vacate the office of any judge.”
It is insisted by the relator that these districts must always continue to be bounded by county lines—that the general assembly has no power to attach Noble county as a whole to any one of these districts ; but if they had, an election was to be held for judicial officers before a general assembly could convene, at which the electors included in Noble county would be deprived of their right of suffrage.
*In support of the first proposition the 3d section of article 4 is relied upon, which provides: “The state shall be divided into nine common pleas districts, of which the county of Hamilton shall constitute one, of compact territory, and bounded by county ■lines,” etc. To construe properly this provision, reference must be had to other parts of the constitution. It certainly can not mean that the number of districts shall always continue to be nine, since power is given to the general assembly to increase or diminish them. It is equally clear that it can not mean that the county limits shall always remain the same, as full power is given to change them and to make new counties. To hold, on the other hand, that ■the limits of the districts must, of necessity, enlarge or diminish with the counties named as embraced in them, would be to say that Hamilton county, so reduced by division as to contain but twenty thousand inhabitants, would still constitute a district and be entitled to elect three judges. When taken in connection with the fact that the convention itself proceeded to make the division z-efei’redto in this section, it is very clear to us that it must be -regarded mainly as prescribing a rule for the government of their own action ; and when they did act in accordance with it, and fixed the districts by definite boundaiues, they must so remain, •securing to all the citizens' included within them their right of suffrage in such districts, until changed by legislative enactment.
But the convention foresaw the difficulty of having the territory included in a new county in different judicial districts or subdivisions, and have provided for it in the most explicit manner in ■article 9, section 13, as follows : “ The general assembly shall attach *387 •any new counties that may hereafter be erected to such districts or •subdivisions thereof as shall be most convenient.”
This section, in our opinion, very clearly applies to any new county erected after the adoption of the constitution by the convention. This construction does not require any ^effect to be given to the constitution before the 1st of September, but, after it has taken effect, it directs the general assembly what to do with counties erected after the 10th of March ; or, in other words, it imperatively requires the general assembly, acting under the constitution, to attach all counties created after that date to some convenient district and subdivision. If this view is correct, the objection that the electors of Noble county could not vote at the judicial election of 1851 has no foundation in fact; but, whether correct or not, it is certainly clear that the general assembly were not only fully •authorized, but required to so attach it as to give its inhabitants the full benefit of the judicial system; and this mandate of the constitution has been obeyed. A failure to do so, at the time the county is created, whether under the former constitution or the present (and the same difficulty from such an omission might now arise), would not make the law repugnant to the constitution, but would only show a necessity for further legislation in order to the enjoyment of all its benefits; it would not nullify what had been properly done, but would require more to be done to make the work perfect. Nor would such a result, by any means, be confined to a case like the present. Time would fail me to enumerate the instances where the enjoyment of constitutional privileges is made dependent upon legislation. Suffice it to say that, while the constitution creates courts, they are utterly powerless to redress wrongs until their jurisdiction is defined bylaw; and while each county is entitled to have sessions of the court of common pleas each year, still none can be held until fixed by the legislature.
Some remarks have been made as to the manner the law under consideration was passed through the legislative body. It is only necessary to say that such considerations can not be permitted to influence judicial action. The members of that body were responsible for their official conduct to the people that elected them, but not to the judicial tribunals. The only question that can here arise is one of constitutional power. If that is found to exist, however much they may *have abused the confidence reposed *388 in them, it can in no degree justify a court in usurping power to-remedy the evils they may have committed. •